UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BERGER MONTAGUE PC**, Movant, v. **ROBINHOOD FINANCIAL, LLC**, Respondent. | Case No. 1:23-mc-75 (Arising from Case No. 2:21-cv-01571-BJR in the U.S. District Court for the Western District of Washington) **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY SEASON 4, LLC** |

## I.    INTRODUCTION

Non-party Season 4, LLC ("Season 4") moves pursuant to Rules 26 and 45(d)(3) of the Federal Rules of Civil Procedure to quash the third-party subpoena issued to it by Respondent Robinhood Financial, LLC ("Robinhood" or "Defendant"), the Defendant in the underlying case pending in the U.S. District Court for the Western District of Washington, *Moore v. Robinhood Financial LLC*, Case No. 2:21-cv-01571-BJR (the "Underlying Action").

## II.    FACTUAL BACKGROUND

### A.    The Underlying Action

The underlying Plaintiffs commenced a putative class action against Robinhood, an online brokerage service firm that enables users to invest in stocks and securities through a free mobile application and website, in the U.S. District Court for the Western District of Washington. The First Amended Complaint alleges that Robinhood promotes its services through its "Refer a Friend" program, by which Robinhood incentivizes and assists its users to send illegal spam text messages generated by Robinhood to their unwitting contacts located in the state of Washington, in violation of Washington's Commercial Electronic Mail Act ("CEMA"), RCW § 19.190 *et seq*.,

and Washington's Consumer Protection Act ("CPA"), RCW § 19.86 *et seq*.  *See* Case No. 2:21-cv-01571-BJR, ECF Doc. 54.

On February 22, 2022, Robinhood filed a motion to dismiss the First Amended Complaint for failure to state a claim.  The District Court entered an Order denying Robinhood's motion to dismiss on August 3, 2022, finding that Plaintiffs plausibly alleged that Robinhood violated the CEMA and CPA.  *Id.*, ECF Doc. 63.

### B.    Background on Season 4, LLC

Season 4 is a company based in Warren, New Jersey, that administers and creates content for the website ClassAction.org.  Declaration of Patrick Hanan ("Hanan Decl.") ¶ 2.  Season 4 provides support services to law firms who advertise through the ClassAction.org website, including information to the public and to prospective law firm clients concerning various pending class action litigation.  *Id.* ¶ 4.  As part of its services, Season 4 strategically coordinates with law firms in connection with pending or anticipated litigation and places advertisements on their behalf.  Season 4 participates in placing advertisements for law firms in connection with pending or anticipated litigation, and those advertisements assist the law firms in identifying prospective clients who wish to be represented by counsel in connection with such litigation.  *Id.*

Of relevance here, Plaintiffs' counsel in the Underlying Action, Berger Montague, asked Season 4 to assist in their ongoing litigation efforts in connection with the Underlying Action.  *Id.* ¶ 6.  Season 4 acted as Berger Montague's agent—conducting advertising on behalf of the law firm, facilitating a connection with prospective clients who may have claims against Robinhood, and forwarding the completed responses from the prospective clients to Berger Montague for their evaluation.  *Id.* ¶¶ 5–6.  The advertisement sponsored by Berger Montage on the ClassAction.org website clearly identified Berger Montague as the law firm pursuing claims against Robinhood.  *See id.*  Prospective Berger Montague clients responded to that advertising by completing an intake

form providing confidential information to allow Berger Montague to evaluate their potential claims and determine if they were likely qualified to be claimants in the litigation.  *Id.* ¶ 7.  All prospective client leads were automatically forwarded to Berger Montague for review, consideration and evaluation, and not transmitted to any other law firm or third party.  *Id.*

Prospective Berger Montague clients responding to Season 4 advertising were expressly made aware that the confidential information provided to Season 4 would be safeguarded, and that Season 4 would protect their privacy and personal data.  *Id.* ¶ 8.  Indeed, Season 4's submission forms were created specifically so that the prospective clients could connect with and seek legal advice from attorneys at Berger Montague, with the expectation that their personal and confidential information would not be made public or disclosed to third parties, such as Robinhood, without their consent.  *Id.*  The completed questionnaires were also in fact kept confidential from all outside parties other than Berger Montague.  *Id.* ¶ 9.  Moreover, the ClassAction.org website similarly advises prospective law firm clients that the information they submit will be maintained as confidential.  *Id.* ¶ 10–11.

Season 4 received completed intake forms from potential Berger Montague clients, but did not have further contact with the prospective clients who responded to the advertising and sought to communicate with Berger Montague.  *Id.* ¶ 12.  Season 4 views the information submitted by the prospective clients as confidential in nature and, in fact, treats it as such.  *Id.* ¶¶ 9, 12.  Season 4 also maintains as confidential its proprietary advertising techniques relating to confidential research and commercial information.  *Id.* ¶ 13.  Season 4 views its ability to protect future claimants' confidential information, as well as the confidentiality of its communications with the law firms that sponsor its activities, as essential to its business and reputation.  *See id.* ¶¶ 13–14.

### C.       Defendant's Subpoena

Robinhood served a subpoena for documents on Season 4 addressed to its former premises in Warren, New Jersey on or about March 4, 2023.  *See* Hanan Decl. ¶ 3, Ex. A (the "Subpoena").  Season 4 thereafter retained counsel on March 16 to assist it in connection with its response.  In order to determine its response to the subpoena and due to the press of other business and personal matters, counsel for Season 4 requested a brief extension of time to respond to the subpoena, until March 31, 2023.  Robinhood's counsel refused that request.  This motion, therefore, is being filed consistent with the date set out for compliance in the subpoena.

Robinhood's subpoena broadly requests in paragraph 1 all communications between Season 4 and any of Plaintiffs' counsel in the Underlying Action or in the actions captioned *Gordon v. Robinhood Financial LLC*, 2:19-cv-0390 TOR (E.D. Wash.) or *Gordon v. Robinhood Financial LLC* (Spokane Cnty. Super. Ct. No.19-2-04574-32), "including but not limited to invoices, correspondence, contracts, and/or agreements."

Paragraph 2 of the subject subpoena calls for all documents referring or relating to ClassAction.org advertisements attached as Exhibit 1 to the subpoena or any other ClasAction.org advertisement referring or relating to text messages sent by or on behalf of Robinhood, including but not limited to:

> a.       All communications between [Season 4] and anyone who responded to advertisements (such as the attached Exhibit 1) referring or relating to text messages sent by or on behalf of Robinhood, including but not limited to the contents of any web form submissions.

> b.       All documents related to the advertisements (such as the attached Exhibit 1), including but not limited to invoices, correspondence, e-mails, and business records.

Exhibit 1 to the Subpoena consists of pages from the ClassAction.org website referencing the "Robinhood Privacy Lawsuit" concerning spam text messages, and a questionnaire link for those

who received spam text messages from a contact inviting the consumer to download Robinhood's app.  The ad states that the information submitted on this page "will be forwarded to Berger Montague."

## III.  LEGAL STANDARD

In relevant part, Rule 45(d)(3)(A) provides that a District Court "**must** quash or modify a subpoena that … requires disclosure of privileged or other protected matter, if no exception or waiver applies," or "subjects a person to under burden."  Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv) (emphasis added).  In addition, Rule 45 expressly permits the District Court to quash or modify a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 45(d)(3)(B)(i).

Subpoenas served upon non-parties pursuant to Rule 45 are subject to the same relevancy and proportionality requirements of Rule 26 as subpoenas served upon parties.  *UMB Bank, N.A. v. Sanofi*, 2017 WL 6398628, at *1 (S.D.N.Y. Nov. 22, 2017); *see* Fed. R. Civ. P. 26(b)(1).  However, when discovery is sought from a non-party, courts "should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party." *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011); *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 9401102, at *1 (S.D.N.Y. Mar. 2, 2017) ("special weight" given to burden on non-parties).

Moreover, "[c]ourts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery."  *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003).  For this reason, "courts generally disfavor subjecting opposing trial counsel to discovery, as it is potentially disruptive of the attorney-client relationship and the adversarial process." *Clare v. Clare*, 2021 WL 6206978, at *3

(E.D. Wash. Nov. 16, 2021).  Courts have found that the rationale for disfavoring a party from seeking discovery from opposing counsel applies equally to depositions and written discovery. *E.g.*, *Rygg v. Hulbert*, 2013 WL 264762, at *1 (W.D. Wash. Jan. 23, 2013) (describing document requests served on opposing counsel as "just as problematic as the deposition requests, and for the same reasons"); *accord Varbero v. Belesis*, 2020 WL 7043503, at *2 (S.D.N.Y. Dec. 1, 2020) ("Dicta in *In re Friedman* regarding the factors to be considered in determining whether to permit deposition of a party's attorney is also instructive for considering the instant document requests."). Moreover, this same reasoning applies with equal force when a party seeks discovery of privileged material from an opposing counsel's agents.  *See United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (explaining the "realities" that attorneys must rely on their agents to assist in the preparation of litigation materials, and that it is therefore necessary to "protect material prepared by agents for the attorney as well as those prepared by the attorney himself").

Under this heightened standard, courts may consider "the need [for the requested discovery], the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Varbero v. Belesis*, 2020 WL 7043503, at *2 (*quoting Friedman*, 350 F.3d at 72).[1]  At bottom, if discovery sought from an opposing attorney "can be obtained from other sources thus eliminating the need to obtain it from the lawyer herself, and if the discovery is of marginal relevance, the case for permitting it is weakened." *Id.*

---

[1] Numerous courts also apply the heightened standard set forth in *Shelton v. Am Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).  However, the heightened standards from Eighth Circuit in *Shelton* and the Second Circuit in *Friedman* "are practically identical." *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 2405295, at *11 (C.D. Cal. Mar. 10, 2020).

Whether analyzed under the heightened standard that applies to subpoenas served on opposing counsel, or under Rule 26 while recognizing the special weight that applies to the burden analysis for discovery served on non-parties, the Subpoena should be quashed.

## IV.    ARGUMENT

The Subpoena is defective for a host of reasons and must be quashed.  On its face, the Subpoena improperly targets communications and documents protected from disclosure by the attorney-client privilege, work product doctrine, and other related privacy considerations.  That is, the Subpoena seeks: (1) confidential communications from Berger Montague's prospective clients who completed intake forms with confidential information in order to have the law firm evaluate their claims and pursue claims against Robinhood—including any prospective clients that became actual Plaintiffs; (2) confidential communications between Berger Montague and Season 4, who acted as that law firm's agent in finding and connecting it with potential plaintiffs in the Underlying Action; (3) the work product of Berger Montague and Season 4 created in anticipation of the Underlying Action; and (4) Season 4's confidential research and commercial information.  Any of these, standing alone, is sufficient reason to quash the subpoena.

But the improper nature of the Subpoena is all-the-more evident because the information Robinhood seeks bears no relevance to the claims and defenses at issue in the Underlying Action, and appear designed to do little more than harass Plaintiffs' counsel, deter potential clients, and create undue burdens on Season 4.  Initial communications from individuals responding to attorney advertising on the internet will not shed light on any facts or issues in dispute in this case. This case concerns whether Defendant violated Washington law by assisting in the transmission of illegal spam text messages in violation of CEMA and the CPA.  There is no circumstance in which individuals' (who may not even be class members) communications in response to an advertisement investigating a potential lawsuit will shed light on the legality of Defendant's

conduct.  Nor will such responses shed light on issues related to class certification or provide Defendant with more information than it already possesses about the composition of the Class. Indeed, Defendant *already has* records that include the phone numbers of everyone to whom its users sent illegal text messages using the "Refer a Friend" on the Robinhood app.  Accordingly, the Court should quash the Subpoena.

### A.   The Subpoena Must be Quashed Because It Seeks Information Protected by the Attorney-Client Privilege

The Subpoena improperly seeks information that is protected by the attorney-client privilege, including: (1) "[a]ll" communications between Season 4 and Plaintiffs' Counsel "in connection with" the underlying lawsuit and related litigation, and (2) "[a]ll" documents relating to ClassAction.org advertisements that seeks to assist potential claimants and prospective clients in obtaining legal services with Plaintiffs' Counsel with respect to potential claims against Defendant; and (3)  "[a]ll" communications between Season 4 and those prospective clients, including "web form submissions" those prospective clients may have confidentially submitted when seeking legal services.  Hanan Decl. ¶ 3, Ex. A.  The attorney-client privilege plainly applies to Season 4's communications with Berger Montague and the prospective clients that have sought legal advice regarding potential claims.

### 1.   *Applicable Law*

In diversity actions, courts "must look to state law to determine questions of privilege." *Conti v. Doe*, 2019 WL 5198882, at *2 (S.D.N.Y. Oct. 1, 2019); *accord* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").  Plaintiffs' claims in the Underlying Action were brought based on diversity jurisdiction, Am. Compl. ¶ 12, and accordingly state law governs determinations of privilege.

To resolve which state's laws on privilege apply, the Court must first look to New York's choice of law rules. *See Tartaglia v. Paul Revere Life Ins. Co.*, 948 F. Supp. 325, 326 (S.D.N.Y. 1996) (explaining that "[f]ederal district courts sitting in diversity cases apply the conflict of laws rules prevailing in the state in which they are situated," and applying New York's choice of law rules to determine which state's privilege laws apply to motion to compel brought under Rule 45 where underlying action was a diversity case brought in the U.S. District Court for the Northern District of Ohio); *accord Bogard Constr., Inc. v. Oil Price Info. Serv., LLC*, 604 F. Supp. 3d 895, 900–01 (N.D. Cal. 2022) (applying Maryland choice of law rules to determine which state's law governs privilege questions because Maryland was the "original forum for this Rule 45 subpoena compliance proceeding" prior to being transferred pursuant to Fed. R. Civ. P. 45(f)).

Under New York's choice of law rules regarding privilege, New York courts ordinarily "apply the law of the place where the evidence in question will be introduced at trial, or the location of the discovery proceeding itself." *Elliott Assocs., L.P. v. Republic of Peru*, 176 F.R.D. 93, 96 (S.D.N.Y. 1997); *accord Tartaglia*, 948 F. Supp. at 326 ("New York choice of law gives controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."). Here, Plaintiffs are located in Washington, Plaintiffs' claims are based on violations of Washington state law, the prospective clients that communicated with Season 4 were located in Washington, and the relevant advertisement placed by Season 4 on behalf of Berger Montague was directed at "Washington consumers" that received illegal promotional text messages from Robinhood "in violation of Washington's Consumer Protection Act." *See* Subpoena at Ex. 1. Accordingly, Washington likely has the "greatest concern," and thus Washington state law should govern determinations of privilege.

However, the Court need not engage in lengthy conflict-of-law analysis because there is no material conflict.  Regardless of which state's substantive law applies, the attorney-client privilege extends to Season 4, which was acting as an agent for Berger Montague by finding and connecting prospective clients seeking legal advice with Plaintiffs' counsel.

### 2. The Attorney-Client Privilege Applies to Communications Between Season 4 and Plaintiffs' Counsel and the Prospective Clients

"The purpose of the [attorney-client] privilege is to encourage free and open attorney-client communication by assuring the client that his or her communications will be neither directly nor indirectly disclosed to others."  *Steel v. Philadelphia Indem. Ins. Co.*, 381 P.3d 111, 118 (Wash. Ct. App. 2016) (internal quotations and brackets omitted).  Under Washington law, "the attorney-client privilege extends to third parties indispensable to an attorney's provision of legal services to the client," where that third party is necessary to facilitate "the effective consultation between the client and the lawyer which the privilege is designed to permit."  *State v. Aquino-Cervantes*, 945 P.2d 767, 771 (Wash. Ct. App. 1997) (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)); *see id* at 772 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.") (quoting *Kovel*, 296 F.2d at 922).[2]

---

[2] *Accord Greenlake Condo. Ass'n v. Allstate Ins. Co.*, 2015 WL 11921419, at *1 (W.D. Wash. Oct. 30, 2015) (collecting cases and summarizing that the "attorney-client privilege extends to agents of the attorney or the client that are essential to the giving of legal advice") (internal quotations and citation omitted); *State v. Gibson*, 476 P.2d 727, 729 (Wash. Ct. App. 1970) (physician-patient privilege extends to physician's agents "present as a needed and customary participant in such consultation," including police officers present to protect the physician); *see also Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 57 N.E.3d 30, 35 (N.Y. 2016) ("[S]tatements made to the agents or employees of the attorney or client … retain their confidential (and therefore, privileged) character, where the presence of such third parties is deemed necessary to enable the attorney-client communication and the client has a reasonable expectation of confidentiality."); *Farzan v. Wells Fargo Bank*, 2012 WL 6763570, at *1 (S.D.N.Y. Dec. 28, 2012) (attorney-client privilege extended to communications made to non-attorney acting as agent of attorney and conducting factual investigation); *H.W. Carter & Sons, Inc. v. William Carter Co.*, 1995 WL 301351, at *3

The result is no different under New York law.  New York, by statute, has codified the principle that attorney-client privilege includes communications between a lawyer referral service and a lawyer and/or prospective client.  *See* N.Y. Judiciary Law § 498 ("The communications between a member or authorized agent of an association or society of attorneys or counselors at law and any person, persons or entity communicating with such member or authorized agent for the purpose of seeking or obtaining a professional referral shall be deemed to be privileged on the same basis as the privilege provided by law for communications between attorney and client.")[3]

_____

(S.D.N.Y. May 16, 1995) (attorney client privilege extended to public relations firm that "participated to assist the lawyers in rendering legal advice"); Restatement (Third) of the Law Governing Lawyers § 70 (cmt. g) (2000) (attorney-client privilege extends to "appropriate nonlawyer staff" and "independent contractors retained by a lawyer, such as an accountant or physician retained by the lawyer to assist in providing legal services to the client and not for the purpose of testifying.").  The answer is also no different under New Jersey law, where Season 4 is located.  *E.g., State v. Blacknall*, 760 A.2d 1151, 1153 (N.J. Super. Ct. Law. Div. 2000) ("In New Jersey, the privilege has been extended to any person who is or may be the agent of either the attorney or the client."); *Conforti & Eisele, Inc. v. Div. of Bldg. & Const., Dep't of Treasury*, 405 A.2d 487, 490 (N.J. Super. Ct. Law. Div. 1979) ("[T]he policy behind extending the attorney-client privilege to an agent of the attorney should apply regardless of the capacity in which the agent acts.").

[3] As commentators have explained, the need to extend the attorney-client privilege to cover communications made to a attorney referral service is obvious, "given that a client often discloses certain information to the referral service in the first instance and the referral service then communicates that information to the lawyer."  Simon's NY Rules of Prof. Conduct § 7.2:30; *accord* ABA Model Supreme Court Rules Governing Lawyer Referral & Information Service, commentary to Rule XIV (available at: https://www.americanbar.org/groups/lawyer_referral/policy/) ("Since a client discloses information to a lawyer referral service for the sole purpose of seeking the assistance of a lawyer, the client's communication for that purpose should be protected by lawyer-client privilege.").  Notwithstanding this statutory privilege recently enacted in New York and other jurisdictions, including California (Cal. Evid. Code § 966) and Oregon (Or. Rev. Stat. § 40.225(2)), "such communications might already have been be protected under the theory that the referral service was acting as agent for either the lawyer or the prospective client, and was merely facilitating communications between the client and the lawyer."  Simon's NY Rules of Prof. Conduct § 7.2:30.  In any event, section 498 "removes any doubt by making clear that such communications will be protected as if they were attorney-client communications."  *Id.*

Thus, to the extent New York law applies, Season 4's communications with Plaintiffs' Counsel, Plaintiffs, and/or any prospective clients sought by the Subpoena are necessarily privileged.

Here, for purposes of applying the attorney-client privilege, Season 4 was acting as an agent for Berger Montague, who sponsored the relevant ClassAction.org advertisement and intake forms used by prospective clients seeking legal advice regarding potential claims against Defendant.  Hanan Decl. ¶¶ 5–6.  Indeed, Season 4 acts as a necessary conduit for prospective clients seeking to obtain legal advice, facilitating the "effective consultation between the [prospective] client and the lawyer which the privilege is designed to permit."  *Aquino-Cervantes*, 945 P.2d at 771; *see* Hanan Decl. ¶ 6.  Prospective clients provide confidential information to Season 4 *precisely because* Season 4 will "forward it to lawyers"—specifically identified as "Berger Montague who has sponsored this investigation"—who then use that protected information to evaluate the strength of any potential claims.  *See id.* ¶ 7; Subpoena, Ex. 1. Moreover, prospective clients are expressly made aware that information they provided to Season 4 will be safeguarded, remain confidential, and only forwarded to attorneys "so that they can provide you with legal services."  Hanan Decl. ¶¶ 10–11.  And in fact, all relevant communications sought by the Subpoenas between Season 4 and (a) the prospective clients responding to the advertisements, or (b) Plaintiffs' counsel were maintained as confidential.  *Id.* ¶¶ 9, 12–14.

Accordingly, the prospective clients' communications with Season 4 are made in confidence for the purpose of obtaining legal advice from Berger Montague, who sponsors the advertisements and intake forms used by Season 4.  As such, Season 4 is acting as the agent of Berger Montague in facilitating the prospective formation of an attorney-client relationship with the prospective plaintiffs.  Season 4's services not only facilitate the attorney-relationship, they are integral to creating that relationship in the first place.  *Id.* ¶ 4

Nor is it of any import to this analysis that Season 4 communicates with prospective clients prior to their retention of counsel, as opposed to clients who have already retained Plaintiffs' counsel.  Under both Washington and New York law, the attorney-client privilege extends to communications with prospective clients.  *Bolding v. Banner Bank*, 2021 WL 1530998, at *2 (W.D. Wash. Apr. 19, 2021) ("Communications from prospective clients with the aim of obtaining legal services are generally covered by the attorney-client privilege, even if the attorney is not ultimately retained," and as such, whether communications with prospective or putative class members are privileged "does not turn on whether they occurred before or after the class was certified or the individual had opted in."); *De La O v. Arnold-Williams*, 2007 WL 9717727, at *2–3 (E.D. Wash. Mar. 8, 2007) (holding that "group meetings with attorneys preliminary to class action litigation are subject to attorney client privilege," and "the contents of such meetings are not discoverable in litigation with persons outside of the group"); *Streichert v. Town of Chester, New York*, 2021 WL 735475, at *7 (S.D.N.Y. Feb. 25, 2021) ("The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance, and therefore may attach to a prospective client's 'initial statements' to an attorney who is not ultimately hired.") (internal quotations and citations omitted).[4]

---

[4] *Accord Coe v. Cross-Lines Ret. Ctr., Inc.*, 2022 WL 17338289, at *5 (D. Kan. Nov. 30, 2022) (explaining that "[t]he practice of gathering confidential information from prospective clients via a questionnaire is fairly common in cases involving large numbers of clients" and holding that the questionnaires were protected under the attorney-client privilege regardless of "[w]hether or not a particular resident had actually retained [the law firm] at the time of submission"); *Vodak v. City of Chicago*, 2004 WL 783051, at *2–3 (N.D. Ill. Jan. 16, 2004) (completed questionnaires by prospective clients were privileged).  Again, the answer is also no different in New Jersey, which expressly defines a "client" for purposes of the attorney-client privilege to include a person or entity that "***consults*** a lawyer or the lawyer's representative for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity."  N.J. Stat. § 2A:84A-20(3) (emphasis added); *accord Herbert v. Haytaian*, 678 A.2d 1183, 1188 (N.J. Super. Ct. App.

The District Court's decision in *Valdez v. Town of Brookhaven*, 2009 WL 10702070, (E.D.N.Y. Feb. 5, 2009) is instructive.  There, non-attorney interviewers and volunteers of a non-profit community organization conducted interviews of individuals alleging that they were wrongfully evicted.  Notwithstanding that these volunteers were "not employees of counsel" and often had "communications with undocumented individuals that do not relate to legal matters," the *Valdez* Court held that the questionnaires used by the interviewers were protected by the attorney-client privilege.  *Id.* at *2.  As the *Valdez* Court summarized: "What is important here is that these communications in particular were initiated at counsel's request, with potential class members, for purposes of obtaining and giving legal counsel."  *Id.*; *accord Don v. Unum Life Ins. Co. of Am.*, 2014 WL 12603207, at *2 (C.D. Cal. Nov. 4, 2014) (explaining that the Ninth Circuit has applied the attorney client privilege "to prospective class members from whom lawyers were gathering information") ((*citing Barton v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 410 F.3d 1104, 1110–11 (9th Cir. 2005)); *Rosso, Johnson, Rosso & Ebersold v. Superior Ct.*, 191 Cal. App. 3d 1514, 1518 (Ct. App. 1987) (attorney-client privilege applies to the identity of nonparty clients or prospective clients, even where those prospective clients were not retained by the law firm).

The communications sought are also privileged, notwithstanding any disclaimer on the ClassAction.org Terms of Use that Season 4 does not provide legal advice and that using the service does not itself create an attorney-client relationship.  *See* Hanan Decl., Ex. C ¶ 4.  The Ninth Circuit addressed a similar issue in *Barton*, where prospective plaintiffs filled out questionnaires with a check box requiring each individual to "disclaim a purpose of 'requesting legal advice,' and to acknowledge that the submitter is not 'forming an attorney client relationship

---

Div. 1996) ("The creation of an attorney-client relationship does not rest on whether the client ultimately decides not to retain the lawyer….").

by sending in the answers." *Barton*, 410 F.3d at 111.  As the Ninth Circuit explained, "the box did not disclaim the purpose of 'securing legal service,' and the questionnaire was "designed so that a person filling it out and submitting it is likely to think that he is requesting that the law firm include him in the class action mentioned at the beginning of the form." *Id.*

Likewise, here, the ClassAction.org website and its Terms of Use both expressly provide that Season 4 will forward users' information to the lawyers sponsoring the relevant submission forms so that their potential claims can be reviewed.  Hanan Decl., Ex. ¶¶ 10–11; *accord* Subpoena, Ex. 1 ("If you received a spam text from a contact inviting you to download Robinhood's app, learn more about how legal action can help…. After you get in touch, *a legal team will review your information*…. The information submitted on this page *will be forwarded to Berger Montague* who has sponsored this investigation.") (emphasis added).  Moreover, the Terms of Use make clear that this information submitted to attorneys will be kept confidential.  ("This Site forwards information you provide … to the lawyers, law firms, legal financial service providers, or other legal service providers as set forth in these Terms of Use and *keeps this information confidential*.") (emphasis added).  *See* Hanan Decl. ¶ 11; *see id.* ¶ 10 ("The only thing we will do with the information you provide us is send it to the attorneys we work with so that you can take legal action or get help. Your information will never go to any other third party.").  As such, potential claimants responding to the relevant advertisement sponsored by Berger Montague are assured that their information will be provided only to Berger Montague, their information kept confidential, and they are "likely to think that [they are] requesting that the law firm include [them] in the class action mentioned at the beginning of the form."  *See Barton*, 410 F.3d at 111.

Season 4 is, at bottom, a necessary conduit that facilitates privileged attorney-client communications between prospective clients and Berger Montague, at Berger Montague's request.

Accordingly, the Subpoena seeks to directly undermine the very purpose of the privilege by chilling the "free and open attorney-client communications" by seeking disclosure of the communications to an adversary. *See Steel*, 381 P.3d at 118; *accord Barton*, 410 F.3d at 1112 ("Potential clients must be able to tell their lawyers their private business without fear of disclosure, in order for their lawyers to obtain honest accounts on which they may base sound advice and skillful advocacy."). The means through which the communications occurred, namely over the internet, and the potential volume of such communications do not change the applicability of the privilege. As the court noted in *Barton*, "[t]he changes in law and technology that allow lawyers to solicit clients on the internet and receive communications from thousands of potential clients cheaply and quickly do not change the applicable principles." *Id.*[5]

**B.    The Subpoena Must be Quashed Because it Seeks Information Protected by the Work Product Doctrine**

Relatedly, the documents and communications sought by the Subpoena are also privileged under the work product doctrine, and thus the Subpoena should be quashed for this additional reason. "While state law generally provides the rules of decision for questions of privilege in diversity actions, federal law governs the applicability of the work product doctrine in all actions in federal court." *Grinnell Corp. v. ITT Corp.*, 222 F.R.D. 74, 77 (S.D.N.Y. 2003) (internal quotations omitted). Fed. R. Civ. P. 26(b)(3) codifies the work product doctrine and provides that ordinarily "a party may not discover documents and tangible things that are prepared in

---

[5] *Accord Harlow v. Sprint Nextel Corp.*, 2012 WL 646003, at *7 (D. Kan. Feb. 28, 2012) (describing class member survey responses as "an efficient substitute for more time consuming face-to-face interviews" that "are used to impart information from client to counsel to promote informed, effective representation," and are accordingly protected by the attorney-client privilege); *E.B. v. New York City Bd. of Educ.*, 2007 WL 2874862, at *3 (E.D.N.Y. Sept. 27, 2007) (questionnaire prepared by government attorneys and responses by government employees were protected by attorney-client privilege and as work product because they "were initially created for the predominant purpose of obtaining or providing level advice," notwithstanding that the documents were later used by other officials "to make policy, budget and planning decisions").

anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent*).*" *Id.* "The work-product rule is designed to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 337 F.R.D. 70, 74 (S.D.N.Y. 2020) (internal quotations omitted), *objections overruled*, 2021 WL 391298 (S.D.N.Y. Feb. 4, 2021). Because attorneys often must rely on the assistance of investigators and other agents in preparation for litigation, the work product doctrine necessarily protects "material prepared by agents for the attorney as well as those prepared by the attorney himself." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 341 F.R.D. 10, 13 (S.D.N.Y. 2022) (internal quotations omitted).

To qualify for protection under the work product doctrine, the material must be: (1) a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) prepared by or for a party, or by his representative." *Id.* The work product doctrine applies to "fact work product," which includes "the result of a factual investigation," and "opinion work product," which includes "material that reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative." *Collector's Coffee Inc.*, 337 F.R.D. at 74 (internal quotations omitted). Opinion work product is "virtually sacrosanct" *McGrath v. Nassau Cnty. Health Care Corp.*, 204 F.R.D. 240, 243 (E.D.N.Y. 2001), and is not discoverable, if ever, absent extraordinary circumstances. *See* Fed. R. Civ. P. 26(b)(3)(B) (courts "must protect against disclosure of the mental impressions, conclusions, opinion, or legal theories of a party's attorney or other representative concerning the litigation"); *Hickman v. Taylor*, 329 U.S. 495, 510 (1947) ("Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.").

Here, the Subpoenas plainly seek documents covered by the work product doctrine.  That is, the Subpoena seeks: (1) the production of documents or tangible things; (2) that were prepared in anticipation of litigation against Defendant for its violations of Washington's CEMA and CPA due to its practice of assisting in the transmission of unsolicited text messages; and (3) the documents sought, including the prospective clients' intake submissions, were prepared on the prospective clients' behalf by Season 4, acting as an agent for Berger Montague.

Indeed, courts have made clear that the information sought by the Subpoenas—including the identities of putative class members—goes to the heart of the interests protected by the work product doctrine by seeking materials that constitute opinion work product.  *Don v. Unum Life Ins. Co. of Am.*, 2014 WL 12603207, at *2, is instructive.  There, the defendant sought to compel production of communications between plaintiff's counsel and six unnamed putative class members.  *Id.* at *1.  The District Court first held that communications between counsel and the putative class members were privileged under the attorney-client privilege, relying on the Ninth Circuit's holding in *Barton*, 410 F.3d 1104.  *Id.* at *2.  Importantly, the District Court was then "equally if not more persuaded" that the communications were entitled to opinion work product protection, including "disclosure even of the identities of the six putative class members."  *Id.*  As the *Don* Court further explained: "disclosure of the identity of the particular putative class members contacted by Plaintiff's counsel would open the door to revealing Plaintiff's counsel's strategy and mindset as to why he might have chosen to interview or contact those individuals and not others; what counsel included in those communications; and perhaps what the insureds later disclosed to Plaintiff's counsel, if that occurred."  *Id.*[6]

---

[6] *Accord Steele v. CVS Pharmacy, Inc.*, 2016 WL 1659317, at *2 (S.D.N.Y. Apr. 18, 2016) ("[T]he identities of third-party witnesses pertinent to this case have the potential to reveal counsel's opinions, thought processes or strategies and are, therefore, protected as work product."); *Kelwin*

The same is true here.  The documents and communications sought would reveal the evaluations, mental impressions, opinions, and legal strategy of Plaintiffs' counsel and Season 4, including, *inter alia*, the identity of putative class members that Plaintiffs' counsel chose to interview as well as which identity of putative class members Plaintiffs' counsel ultimately chose not to include as a named party.  This information is squarely opinion work product, and as such, is "virtually sacrosanct" and not discoverable absent extraordinary circumstances.  *See McGrath*, 204 F.R.D. at 243.  As discussed below, the information sought by the subpoenas is utterly irrelevant to the underlying claims and defenses at issue in the litigation, and thus Defendant falls *well* short satisfying the heightened standard necessary to overcome the work product doctrine.

### C.   The Subpoena Must be Quashed Because It Seeks Disclosure of Other Protected Matters

Separately, even absent the attorney-client privilege and the work product doctrine that apply to the documents and communications sought by the Subpoena, the Subpoena must be quashed because it also seeks sensitive information that would invade prospective clients' reasonable expectation of privacy when submitting information for the purpose of seeking legal advice.  Fed. R. Civ. P. 45(d)(3)(A)(iii) requires that District Court quash or modify a subpoena

---

*Inkwel, LLC v. PNC Merch. Servs. Co., L.P.*, 2020 WL 13077200, at *5 (E.D.N.Y. June 5, 2020) (discovery request asking "asking plaintiffs' counsel to go through the list of witnesses and identify which witnesses counsel chose to interview" is "clearly work product"); *United States v. Vepuri*, 2022 WL 3648184, at *2 (E.D. Pa. Aug. 24, 2022) ("The compilation of witness lists and other materials by or at the direction of counsel can constitute work product."); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 2644243, at *5 (N.D. Ill. June 27, 2019) (interrogatory "asking defendants to identify the people their lawyers selected to interview" seeks "to reveal their lawyers' mental processes," and is thus "an impermissible invasion of work product"); *Ferruza v. MTI Tech.*, 2002 WL 32344347, at *3 (C.D. Cal. June 13, 2002) ("Although the identity and location of witnesses that may have knowledge of any discoverable matter is not protected, the identity of witnesses interviewed by opposing counsel is protected" as work product and goes "to the heart of the work product rule."); *Seebeck v. Gen. Motors Corp.*, 1996 WL 742914, at *1–3 (N.D. Ga. May 17, 1996) (list of witnesses interviewed by the attorney was protected as work product because the decision as to which persons to interview was based on legal work and analysis).

that requires disclosure of not only privileged materials, but also "other protected matter." *Id.* It is well established that a subpoenaed party's privacy interests may constitute "other protected matter" for purposes of Rule 45. *See Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336–37 (11th Cir. 2020) ("[F]ederal courts have recognized that privacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege.") (collecting cases).[7]   Indeed, an individual's right to privacy is enshrined in the Constitution of the State of Washington, which provides that "[n]o person shall be disturbed in his private affairs … without authority of law." Wash. Const. art. I, § 7.

Here, Season 4, Berger Montague, and the prospective clients had a reasonable expectation of privacy that the documents and communications sought by the Subpoena would remain confidential. Indeed, the submission forms were created specifically so that the prospective clients could connect with and seek legal advice from Berger Montague, with the expectation that their personal and confidential information would not be made public or made available to Robinhood— the very party whose actions prompted the prospective clients to seek legal advice in the first place. *See* Hanan Decl. ¶ 8. Moreover, Season 4 had a reasonable expectation, and at all times believed, that its communications with Berger Montague and information received from prospective clients would remain protected from disclosure to Defendant. *Id.* ¶¶ 8–9, 12–14. Indeed, given that the Rules of Professional Conduct generally prohibit lawyers from using or revealing information

---

[7] *Accord S. California Hous. Rts. Ctr. v. K3 Holdings, LLC*, 2022 WL 17333390, at *9 (C.D. Cal. Oct. 18, 2022) ("Federal courts ordinarily recognize a constitutionally-based right of privacy that can be raised in response to discovery requests."); *Bhatt v. Lalit Patel Physician P.C.*, 2020 WL 13048694, at *3 (E.D.N.Y. Oct. 19, 2020) ("[t]ax returns constitute 'other protected matter'" under Rule 45 due to "the private nature of the sensitive information contained therein"); *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 928 (7th Cir. 2004) (affirming district court's order quashing subpoena seeking medical records based on privacy concerns of patients).

learned from a prospective client "[e]ven when no client-lawyer relationship ensues," Wash. RPC 1.18, prospective clients had a reasonable expectation of privacy in their communications for the purpose of seeking to be represented in the Underlying Action.

The need to protect the communications and documents relating to prospective clients seeking legal advice raise broader public interest and privacy concerns that must be protected from disclosure, either as specifically privileged or as an "other protected matter" under Rule 45(d)(3)(A)(iii).  As a matter of public policy, courts have recognized the need to protect communications made by prospective clients seeking legal advice in order to encourage "full and frank disclosures," *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108, (2009), and the need to protect the "zone of privacy" for attorneys and their agents to "prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by [an attorney's] adversaries." *See New York Times Co. v. United States Dep't of Just.*, 939 F.3d 479, 489 (2d Cir. 2019).  The State of Washington has a strong public policy interest in the application of its CEMA and CPA, which the Washington legislature recognized in amending and expanding the scope of CEMA in 2003.  *See* Order dated August 3, 2022 (ECF Doc. 63), denying Defendant's motion to dismiss the Amended Complaint, at 4. Enforcement of the Subpoena would undermine these important public policy concerns by discouraging those with potential claims under these statutes from coming forward if their confidential information intended for counsel was subject to disclosure to the spam text violator.

### D.    The Subpoena Should Also be Quashed Because It Seeks Disclosure of Season 4's Confidential Research and Commercial Information

Fed. R. Civ. P. 45(d)(3)(B) also expressly permits courts to quash or modify a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  The documents and communications sought by the Subpoenas—(over)broadly

seeking "[a]ll documents" and business records relating to Season 4's advertisement, "all communications" from anyone who responded to the advertisement, and any invoices, contracts, and agreements with Plaintiffs' counsel in connection with the underlying lawsuit—necessarily encompasses Season 4's confidential research and commercial information. *See* Hanan Decl. ¶ 13. As discussed below, Season 4's confidential marketing contracts and other financial information are in no way relevant to the claims and defenses at issue in the Underlying Action, and disclosure would seriously harm Season 4's business. *Id.* ¶ 13. Moreover, the information sought by Defendants—confidential communications made by prospective clients seeking to be connected with lawyers for the purpose of obtaining legal advice—goes to the heart of Season 4's commercial interests. Disclosure would have the potential to create an enormous chilling effect, limiting the likelihood that other potential future claimants will respond to Season 4's advertisements, and therefore risks serious harm to Season 4's commercial interests. *See id.* ¶¶ 13–14.

Accordingly, the Subpoena should be quashed for this additional reason. *See HP Tuners, LLC v. Sykes-Bonnett*, 2018 WL 10398216, at *1 (W.D. Wash. Sept. 12, 2018) (quashing subpoena seeking "confidential information such as the identities of [defendant's] customers").

### E.    The Subpoena is Overbroad, Unduly Burdensome, and Not Proportional to the Needs of the Case

Courts recognize that "the 'undue burden' analysis is tied to the relevance of the material sought and is directly related to the court's decision to quash a subpoena for imposing an undue burden." *Breaking Media, Inc. v. Jowers*, 2021 WL 1299108, at *7 (S.D.N.Y. Apr. 7, 2021). "A subpoena seeking testimony with little apparent or likely relevance to the subject matter may be quashed even if the burden on the deponent is not onerous." *Lynch v. City of N.Y.*, 2021 WL 4652305, at *2 (S.D.N.Y. Oct. 5, 2021) (citations omitted). "[T]he Court may modify or deny discovery requests when the information sought is not relevant or proportional to the needs of the

case, the expense or burden outweighs the likely benefit, and/or when the discovery sought is unduly burdensome or expensive." *Id.*

By its Subpoena, Robinhood seeks myriad documents from Season 4. None of the documents sought are relevant to any claims or defenses in the Underlying Action. The Underlying Action arises out of allegations that Robinhood assisted in the transmission of unlawful text messaging to Plaintiffs and proposed class members in Washington in violation of the CEMA and CPA. The contents of communications or invoices between Season 4 and counsel for Plaintiffs in the Underlying Action are irrelevant to determining whether Robinhood violated those statutes. Similarly, information relating to advertising to locate potential plaintiffs is irrelevant to the claims and defenses at issue in this case. *See Nguyen v. Lotus by Johnny Dung Inc.*, 2019 WL 3064479, at *4 (C.D. Cal. June 5, 2019) (denying discovery of solicitations and retainer agreements because "any arguable, minimal relevance of documents concerning solicitations or demand letters by counsel within the last five years or legal retainers in this case to any party's claim or defense is more than offset by the burden and expense in comparison to its likely benefit and its importance in resolving the issues"); *Sanderson v. Winner*, 507 F.2d 477, 479 (10th Cir. 1974) (refusing to compel fee arrangement documents because the court "fails to see relevancy in [defendant's] inquiries" into such documents).

To the extent that Robinhood contends that these documents are somehow relevant to class certification issues, such as adequacy of counsel, that contention should also be rejected. "When assessing adequacy of counsel, courts are generally skeptical of defendants' ethical attacks on class counsel." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 47 (S.D.N.Y. 2012). Permitting Robinhood to police the adequacy of class counsel is like "permitting a fox ... to take charge of the chicken house." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890,

895 (7th Cir. 1981). This kind of behavior by class action defendants "has convinced courts to preclude, or severely limit, their ability to raise alleged ethical violations in the context of class certification." *In re Pfizer*, 282 F.R.D. at 48. As a result, the subpoenaed documents are unlikely to be considered in determining counsel's adequacy and, thus, not proportional to the needs of the case because the burden on Season 4 would far outweigh any speculative benefit. *See Walker v. Alta Colleges, Inc.*, 2010 WL 2710769, at *7 (W.D. Tex. July 6, 2010) (finding that discovery into communications potentially relevant to counsel's adequacy should be protected because "the slight chance that the information would be relevant does not justify the burden and expense of conducting additional discovery on these peripheral issues"). In any event, Robinhood cannot show why discovery from the *parties themselves* would be insufficient to address any issues relevant to class certification. *Blackrock Allocation Target Shares*, 2017 WL 9401102, at *2 (denying motion to compel non-party subpoena where defendant could otherwise "obtain meaningful relief from the parties themselves").

Moreover, compliance with the Subpoena would be unduly burdensome and risks serious harm to Season 4's business interests going forward. As noted above, the Subpoena is overbroad on its face, seeking *all* communications with Plaintiffs' Counsel regarding the Underlying Action, *all* documents related to the ClassAction.org advertisement, and *all* communications with prospective clients (including the prospective clients that became actual Plaintiffs) that responded to the advertisement. Even more fundamentally, Defendant's efforts to seek discovery regarding communications from potential clients responding to Season 4's advertisements will likely cause material harm to Season 4's future business efforts. *See* Hanan Decl. ¶ 13–14. Season 4's submission forms are designed to allow prospective clients to securely submit information regarding potential claims, with the expectation that the information will be forwarded to

Plaintiffs' counsel for the purpose of evaluating potential legal claims.  *See id.* ¶¶ 8–12.  Allowing Robinhood access to these confidential communications meant for Berger Montague—when Robinhood is the very party that prompted these prospective clients to seek legal advice because they believe they may have potential claims against Robinhood—would likely deter future claimants from responding to such advertisements.  *Id.* ¶ 14.

Similarly, requiring Season 4 to disclose its communications with Plaintiffs' counsel to Robinhood, regarding the very litigation for which counsel hired Season 4, will also likely cause significant harm to Season 4's business.  *See id.* ¶¶ 13–14.  Season 4's business depends on its ability to maintain the confidentiality of its communications with the lawyers that hire Season 4 for the purpose of assisting with their litigation efforts.  *See id.*  If all of these privileged communications were discoverable to an adversary—including an attorney's confidential communications regarding litigation strategy—attorneys will be far less likely to retain Season 4 and Season 4's ability to effectively provide its services would be undermined.  *See id.* ¶ 14.  The undue burden here is particularly acute, given that (a) none of the information sought is relevant to the actual claims and defenses in the litigation, and (b) Robinhood already has information regarding any potential claimants—after all, Robinhood was responsible for assisting its users send the illegal texts to Washington residents that form the basis of the claims.

Given the above, Robinhood's discovery efforts seem designed to simply harm Season 4 and Plaintiffs' counsel, and deter potential plaintiffs from bringing claims.  The Subpoena should be quashed.

## V.   CONCLUSION

For the foregoing reasons, Season 4 respectfully requests that the Court quash the Subpoena served on Season 4.

Respectfully submitted,

**COZEN O'CONNOR**

Dated:  March 21, 2023                    By:  _/s/ Keren Goldberger_____
                                               Keren Goldberger (KG5428)
                                               3 WTC, 175 Greenwich St., 55th Fl.
                                               New York, NY 10007
                                               Tel: (212) 453-2254
                                               Email: kgoldberger@cozen.com

                                               Haryle Kaldis (to be admitted *pro hac vice*)
                                               1650 Market Street, Suite 2800
                                               One Liberty Place
                                               Philadelphia, PA 19103
                                               Tel: 215-665-5559
                                               Email: hkaldis@cozen.com
                                               *Of Counsel:*

                                               Thomas G. Wilkinson, Jr.
                                               1650 Market Street, Suite 2800
                                               One Liberty Place
                                               Philadelphia, PA 19103
                                               Tel: 215-665-2000
                                               Email: twilkinson@cozen.com

                                               *Attorneys for Non-Party*
                                               *Season 4, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 21, 2023 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and that foregoing document is being served on all counsel of record identified below via Federal Express and electronic mail upon the parties' following counsel of record:

TERRELL MARSHALL LAW
GROUP PLLC
Beth E. Terrell, WSBA #26759
Jennifer Rust Murray, WSBA #36983
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Tel: (206) 816-6603
Fax: (206) 319-5450
Email:  bterrell@terrellmarshall.com
            jmurray@terrellmarshal.com

BERGER MONTAGUE PC – CA
Sophia Rios (*pro hac vice*)
401 B Street Suite 2000
San Diego, California 92130
(619) 489-0300 | Phone
Email: srios@bm.net

BERGER MONTAGUE PC – MN
E. Michelle Drake (*pro hac vice*)
1229 Tyler Street NE Suite 205
Minneapolis, Minnesota 55413
Tel: (612) 594-5933
Fax:  (612) 584-4470
Email:  emdrake@bm.net

***Co-Counsel for Plaintiffs in the Underlying
Action***

DAVIS WRIGHT TREMAINE LLP
Lauren B. Rainwater, WSBA #43625
Kenneth E. Payson, WSBA #26369
Eric A. Franz, WSBA#52755
Theo A. Lesczynski, WSBA #59780
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Tel: (206) 622-3150
Fax: (206) 757-7066
Email: laurenrainwater@dwt.com
            kenpayson@dwt.com
            ericfranz@dwt.com
            theolesczynski@dwt.com

***Counsel for Robinhood Financial, LLC***

*/s/ Keren Goldberger*
Keren Goldberger